UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN HENRY MONK,

                        Petitioner,                **No. 09-CV-0932(VEB)**

      -vs-                                    **DECISION AND ORDER**

MARK L. BRADT, Superintendent,

                        Respondent.

_____

## I.     Introduction

Petitioner *pro se* John Henry Monk ("Monk" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 6, 2006, Monk was indicted for the June 2005 murder of Sandra Hainesworth ("Hainesworth" or "the victim") in her home. Monk became a suspect after detectives in the Buffalo Police Department's "cold case" squad matched DNA evidence found at the crime scene to a DNA sample that Monk had previously submitted to the state-wide DNA databank. Following a jury trial in New York State Supreme Court (Erie County), the jury convicted him of one count of first degree murder (New York Penal Law ("P.L.") § 125.27(1)(a)(vii)),[1] one count of first degree burglary (P.L. § 140.30(3)), and one count of third degree criminal possession of a weapon (P.L. § 265.02(1)). In his Section 2254 petition, Monk contends that his state-custody is unconstitutional as the result of certain constitutional errors at his trial.

---

[1]      Under P.L.§ 125.27, every first degree murder must include an intentional (second degree) murder. *People v. Cahill*, 2 N.Y.3d 14, 64 (N.Y. 2003). "An additional aggravating factor–murder "plus"–raises the crime to murder in the first degree." *Id.* Here, Monk was charged with first degree murder based on the allegations that he committed first degree burglary by breaking into Hainesworth's house with the intent to commit a felony therein, and that, in the course and furtherance of the burglary, he killed Hainesworth intentionally. *See id.* (citing N.Y. PENAL LAW § 125.27(1)(a)(vii)).

II.     **Factual Background and Procedural History**

A.      **The Prosecution's Case**

1.      **Kimberly King, the Victim's Neighbor**

On the day of Hainesworth's death, Kimberly Lynette King ("King") noticed that her neighbor had not answered her door or telephone all day. T.382.[2] Finally, at around 9:00 P.M., King decided to go into Hainesworth's house to check on her. T.383.

As King approached the house, she noted a blue garbage tote or container outside by a first-floor window; there was broken glass in the area. T.383. King testified that the blue garbage tote was "never there by her window" before. *Id.* When King put her hand up to the window, she thought "something is not right." *Id.* King went and got her husband.

Upon entering the house, they could see that it had been ransacked: "The curtains were a mess[,]" torn from the wall; there were "papers everywhere"; the "kitchen table was . . . a mess"; drawers were open in the bedroom; and "things in the bathroom didn't look right." T.385. King, who had regularly been inside Hainesworth's house two to three times a week, stated that she had been invited inside the house on June 23rd, the day before the murder, and everything was "clean" and "in place." T.387. King testified that the kitchen window had not been broken; Hainesworth "would never stay there in the house if a window was broken" and "[a]nytime something got broken like that it would be fixed right then." T.387. King did not see any blood on the kitchen floor. T.387. King stated, "When you go to Miss Sandra's house everything is always in place." T.388.

King and her husband found Hainesworth's body in the bedroom. She was lying sideways

---

2       Numbers preceded by "T." refer to pages from the transcript of Monk's trial.

across her bed, and her left hand was tied to the bedpost while her legs dangled a little off the bed. T.384. King said that she saw "a lot of blood." T.385. King immediately began trying to call the police.

### 2.    The Crime Scene Investigation

Buffalo Police Department Detectives Michael Mordino ("Det. Mordino") and Michael Acquino ("Det. Acquino") went to 500 Goodyear Street at 10:10 P.M. in response to King's 911 call. T.390, 444. Det. Mordino observed the blue garbage tote near the broken window on the south side of the house. T.392. Several cigarette butts that appeared to have been recently discarded near the garbage tote, which had footprints on top of it. T.392-93. Det. Mordino deduced that the window above the garbage tote had been the point-of-entry into Hainesworth's house. T.392.

Inside the kitchen, Det. Mordino found some broken glass, as well as a brick that was similar appearance to a brick he had noticed in the backyard. T.395. He also found a telephone cord on the table; the cord had a small blood smear on it. T.395, 405. A small droplet of blood was present on the floor near the kitchen table. T.403. A wrapped envelope containing $875 was discovered in Hainesworth's freezer. T.407-08, 484.

In the bathroom, Det. Mordino found Hainesworth's underwear in the sink and a bottle of rubbing alcohol sitting on the floor. T.397. He also noticed that there were a couple of pink washcloths on the floor and there was something (either tissue or a rag) inside the toilet. T.397.

In the bedroom, Det. Mordino found the body of an elderly black female, tied with white pantyhose or nylons to the bedpost; both arms were tied at the wrists. T.398. The victim was wearing a nightgown but was nude from the waist down. She had one sneaker on her left foot.

T.417l. Bloody stab wounds were "all around" her neck area. The victim had an orange kerchief on her head; wrapped around her face, covering her mouth and eyes, was a pink towel. T.398. There was a purse, with its contents emptied out, on the bed. T.417.

Det. Acquino performed a canvass of the victim's neighborhood. A friend of the deceased named Ruffin told him about a nephew, David Johnson ("Johnson"), who had a crack cocaine addiction. T.447, 450.  Johnson denied anything to do with the crime, stating that he was with a female companion. T.447. Johnson provided a DNA sample by means of a buccal (interior of the mouth)  swab; the results eliminated him from being at the crime scene. T.447.

A few days later, the police received a lead about Jeffrey Dubose ("DuBose"), whom one of the victim's neighbors had seen near the house on the day of the murder. T.448. Dubose, however, had an alibi which checked out. T.449. In addition, Dubose gave a DNA sample, the results of which eliminated him from the murder scene. T.449.

Detective James Maroney ("Det. Maroney") assisted with evidence collection at the crime scene. T.470 *et seq.* In particular, Det. Maroney catalogued the "very slight impression of a shoe or a sneaker in dirt" on top of the blue garbage tote; the cigarette butts lying in the driveway; and a soda bottle by the side door to the house. T.473. There were no usable latent fingerprints or DNA on the garbage tote. T.475. The cigarette butts seemed fairly fresh, though they did not have any ashes attached, so they had been there for a little while. The DNA results from the cigarette butts indicated they were from an unidentified male and did not match Petitioner's DNA profile. T.525.  The sneaker print was not able to be individualized; the report just came back as a saw-tooth shoe print pattern with no real class characteristics. T.477.

Det. Maroney, during his investigation, found some small, copper-colored filaments on

the bedroom floor, the type of material sometimes used to stuff the inside of a crack pipe. T.485, 512. With regard to the usable latent prints found in the house, the police were unable to connect them with anyone who had been arrested before. T.500. The blood droplet on the floor in the kitchen was fairly intact; it had not flaked or cracked. T.507.

As set forth further below in the forensic serologist's testimony, the telephone cord with the dry red smear-type stain on it was submitted for testing, and the profile from the stain matched Petitioner's DNA profile. T.527.

### 3.    Petitioner's Arrest

On April 17, 2006, Detective Charles Aronica ("Det. Aronica") of the Homicide Cold Case Bureau received a call from Det. Mordino indicating that they had a DNA match from the Hainesworth case. T.552. Later that day, Det. Aronica and his partner interviewed Petitioner at the police department. T.553. Petitioner waived his *Miranda* rights and agreed to speak with the detectives. T.555-56. He did not ask why they wanted to talk to him.

When asked where he had been in June 2005, Petitioner stated that he had been living at 17 West Utica, in a veteran's housing facility. T.559. Petitioner was familiar with Goodyear Street; his former fiancée, Kathy McIlwain, lived on Goodyear Street near East Ferry with her daughter. T.560. Petitioner stated that the last time he had been on Goodyear Street was between 2003 and 2004; the latest would have been 2004. T.560. Det. Aronica asked Petitioner this question different ways at least six times; each time, Petitioner stated that he had not been on Goodyear Street in 2005; that the latest time he would have been there was 2004; and he stated the was "positive" about that. T.560, 561. The last time he had been there, he had picked up Hainesworth and McIlwain to go buy cigarettes in 2004. T.562.

When asked if he knew Hainesworth, Petitioner said that he did and that he also knew her late husband, Leo. Petitioner said that he used to go over and visit with Leo; they would watch basketball games together. T.561. Petitioner said that he had been inside the house "maybe three times", and indicated that he had been in the bathroom, the kitchen, and the food pantry. T.563. Petitioner denied ever having been in a bedroom at Hainesworth's house. T.564.

When asked about the last time he saw Hainesworth, Petitioner began "volunteering information about his medical problems", saying that it had to be no later than 2004 because he was "quite sick" in 2005. T.562. He specifically denied being at the victim's house on June 23rd or June 24th of 2005, explaining that he was not able to get around, that he had to use medical transportation, that his feet were swollen, and that he had a spinal infection. T.562, 563. Petitioner explained that he did not work and collected disability insurance–approximately $600 per month.

Det. Aronica asked Petitioner if he had ever been romantically involved with Hainesworth and he answered, "[N]o way." T.564. Petitioner told Det. Aronica that Hainesworth had three or four boyfriends. T.571.

Petitioner flatly denied killing Hainesworth. T.564.  Det. Aronica's last question was: "[Y]ou tell me how your DNA got into Sandra Hainesworth's bedroom." T.565. Petitioner "got up from his chair, he says, I know where this is going, I need a lawyer. And he walked out of the room." T.565. Up until that question, Det. Aronica had not told Petitioner that his DNA had been found inside the house. T.565.

### 4.       The Jailhouse Informant

John Avent ("Avent" or "the informant") gave a statement under oath to Det. Aronica on

May 20, 2006, regarding a conversation he allegedly had with Petitioner at the holding center the

month beforehand. Det. Aronica testified that the first time he saw Avent was on May 20th and

that he did not tell Avent that the murder appeared to have been part of a burglary. T.568.

At trial, Avent testified that he was forty-years-old and was currently in the Erie County

Holding Center on a parole violation and an arrest warrant for failing to appear at a hearing in

Monk's case. T.582. Avent pled guilty in 1986 to second degree assault for throwing a baseball

bat a woman's head after she had thrown a bat at him during an argument with some people over

a baseball game they had all played in. T.584. Avent violated the terms of his probation and had

to serve jail time for that. He was also convicted in 1986 for stealing a car; he was having a few

drinks at the friend's house and took the keys and drove off with the car. T.585. In 1991, he was

convicted of first degree robbery for robbing a convenience store after having been out drinking

all night. T.586. Avent explained that he put his hand underneath his shirt, pretending it was a

gun. T.586. He did not really have a gun on him at the time. *Id.* Avent was sentenced to 11 to 22

years for that offense.

After serving the minimum (11 years), he was paroled in 2001 and was currently on

parole in regards to that conviction at the time of Monk's trial. T.587. During that time, his

parole had been revoked four times for smoking marijuana T.588. Avent admitted that he had

had a drug problem[3] throughout his life–marijuana, cocaine, acid, crack, mushrooms,

---

[3]       During the week preceding February 25, 2006, Avent had smoked a total of about three ounces of crack cocaine. When he arrived at his fiancee's house, he got into an argument with her; she said she did not want anything to do with him anymore because of his drug life, so she took two knives out of the drawer and locked himself in the bathroom and threatened to kill himself. T.590. The police came; he would not come out right away and they communicated through the door for about forty-five minutes. T.591. Eventually, after the police promised to get him help, Avent agreed to throw the knives out the back window and surrendered. *Id.* He was charged with a felony and pled down to a class B misdemeanor, time served. T.591. The arrest for possession of the knives was a parole violation, which resulted in a parole detainer being lodged against him. T.592.

heroin–"[j]ust about everything." T.589.

After testifying about his criminal history, Avent testified about his encounter with Monk in April 2006 at the Erie County Holding Center. T.593-95. They were both housed in "Delta Long" block although they had separate cells. T.595. Avent had been there for a while before Monk arrived. One day, during recreation period in the unit, Avent went up to Monk and asked him what he was doing there–"just normal conversation." T.596-97. Monk showed him a letter he had received; Avent assumed it was from a girlfriend because it said "I love you, things like that." T.597. The letter was "saying that she shouldn't be writing a letter, she should not let him know but that the detectives were questioning her about the homicide pertaining to John Monk." T.597. Avent did not know who the letter was from. *Id.* As of that time–April 2006–Monk had not been charged or arrested in connection with the Hainesworth homicide. *Id.*

A couple of days later, Avent had another conversation with Monk in front of Monk's cell. Monk said that there were

> a few things that was [sic] bothering him that he needed to get off his chest, and he stated that it was a burglary eventually ended up going bad. He had broke into . . . the house to burglarize it, to look for a few things, and in the process of going through certain things a lady came out [of] a room and surprised him that he thought was sleeping, and he grabbed her by the neck, they were wrestling, he was choking her, and next thing you know he said that he started stabbing her.

T.598. Monk told Avent that he had been at the victim's house before the murder. *Id.* Monk did not say how he had gotten into the house; nor did he say why he thought Hainesworth had been sleeping. T.599. Monk did not say where he had gotten the knife or how many times or where he had stabbed her.

After Monk stabbed the victim, he "found a few things that he had to conceal so he could

leave" and "took a few things that he had under his jacket" and "went down the street with those things" to a crack house where he bartered them for some crack. T.599-600.

A few days later, Avent saw a news report about Monk being arrested. T.600. Avent "was kind of shocked that what he told me was actually was true." *Id.*

Monk got transferred to the medical unit within the jail and Avent, as part of his job duties, had the occasion to go to Monk's dorm at the medical unit. Avent said, "John, what's up, you know, what's–being on the news, you know." T.602. According to Avent, Monk replied, "I'm not worrying about it, says they don't have anything on me, I got this beat." T.602.

Avent testified that he had seen Monk wearing arm braces. However, Monk did not tell him anything about the braces or his ability to walk. T.602.

On May 15, 2006, three days after Monk's arrest, Avent wrote to the Erie County District Attorney's Office indicating that he had information about the Hainesworth case. T.603. Avent came to speak to the detectives on May 20th. In July 2006, Avent met with the prosecutor who promised to make a recommendation that he should receive only a year's incarceration for his parole violation if he cooperated in Monk's prosecution. T.607.

Avent testified at the grand jury but subsequently violated the terms of his parole again and also failed to appear at a preliminary hearing in Monk's case. T.608. As a result, the prosecutor had a warrant issued for his arrest. *Id.* The prosecutor promised that if Avent testified at trial, he would recommend to the parole board that Avent some type of alternative to incarceration in connection with the latest parole violation. T.609.

With regard to his statement, Avent testified that the police never told him any details about the Hainesworth murder or crime scene. T.609-10.

On cross-examination, defense counsel pointed out that Avent was handcuffed and chained around the waist. T.610. Avent claimed that he was testifying because he wanted the person who was guilty of the murder to be convicted. T.611. Avent admitted that in his letter to the District Attorney he said that they "needed [him] because all they had was DNA evidence" but he would not testify unless he got released. T.621.

### 5.   Testimony Regarding Petitioner's Physical Condition

Forty-five-year-old Berlincia Marie Easterling ("Easterling") testified for the prosecution about Monk's medical condition and the extent of his physical disabilities. T.629 *et seq.* Easterling had known Monk for about six years; they dated for a while in 2005. T.630-31. During 2005, she saw Monk almost every day. He did "[n]ot always" wear his arm braces; he used them, according to Easterling, '[e]very now and then." T.631. Easterling said that when she saw him, it was "[m]ostly without" his arm braces. T.632.

During 2005, Easterling saw Monk perform some physical tasks without his arm braces–he got up on a chair and washed the walls in her house, and helped her landlord cut down a small tree. T.631-32.

On the day of Hainesworth's murder, Monk called Easterling on the phone and mentioned that a friend of his named Sandra had been killed. T.632-33. Monk "said whoever had did [sic] it must have known because they wasn't [sic] suspecting that he had – anybody had broke in the house, that she had allowed them in." T.633. Monk told her that he had found out she was murdered that day when was over that way on Goodyear Street with some friends. T.633.

Defense counsel had Easterling confirm that Monk did use his arm braces during 2005 and that "[a]t some times", he appeared to be in great pain. T.634. Easterling would not answer

directly whether, when he appeared to be in pain, he was able to get around without the braces; she stated, "[h]e got around sometimes, sometimes he didn't." T.635.

Eighty-year-old Katherine McIlwain ("McIlwain") testified next for the prosecution. She had known Hainesworth over 25 years and described her as "just like a sister . . . ." T.637. They would talk to each other every day. T.637.

McIlwain met Monk in 1991 through her pastor, Reverend Lewis, and they became "real good friends at church." T.639. For a short time in the early 2000s, Monk rented a room from her and they became romantically involved for a bit. T.639. McIlwain observed Monk "a lot of times without his arm braces" walking around in the apartment. T.640. Occasionally if he would go out, he "would maybe take one . . . ." T.640.

In February or March 2005, Monk came over to McIlwain's house and asked to borrow some money. They conversed through the speaker intercom; Monk did not come inside. T.640. However, "he kept ringing . . . and kept ringing" the buzzer, asking to borrow money. *Id.* Finally, McIlwain asked to please leave or she was going to call the police. She did call the police but they did not come until two hours later, and by that time he was already gone. *Id.*

McIlwain testified regarding a letter she had received from Monk on May 18, 2007, while he was in jail. T.643. She had previously written to him to ask him about the DNA evidence the police had found at the scene. The pertinent part of the letter from Monk read as follows:

Dear Katherine,

I hope and pray that when this letter become you to read that it will find you to in the best of health and in the best of God's spirit too. I will do my best to answer your letter about the DNA. Well, here go. If you can remember the time the glass got broken in Sandra['s] kitchen when you was [sic] having a drink with her, you was [sic] the cause of the glass to fell [sic] from the table to the floor. It had fell

[sic] all in and around the phone cord. I came from the living room to clean it up. Why [sic] I were [sic] cleaning I cut my hand and when I was moving the phone cord out of the way a drop got on the cord, my blood. And when you was [sic] going to help Sandra said she would clean the rest up later. This was in April 2005 when we brought the alcohol and take [sic] it to her. I did not do it because if I had did [sic] it the place would be clean[ed] out if it was me. So believe me when I say it were [sic] not me because around that time I was too sick, if you remember, I can not get around, I had to have help because you came over to see about me. Remember. I put something in this letter so you can see. With that I will close this letter but not my thought of you.

. . . .

T.645-46 (People's Exhibit 82).

McIlwain testified that she "never" saw Monk in 2005 at all; they only had conversed through her intercom. She was not with him at Hainesworth's house in 2005 at all. In short, there was nothing truthful in the letter. T.646.

McIlwain stated that Monk never admitted to her in his letters that he had killed Hainesworth. T.647. McIlwain admitted speaking to an investigator for the defense and telling him Monk told her that he had back problems and spasms in his legs. T.647-48. McIlwain denied telling the investigator that Monk used two arm braces the majority of the time. T.648. She admitted sometimes driving Monk to his doctor's appointments; sometimes he would take the bus. T.648. McIlwain denied that she told the investigator that she did not think Monk was capable of climbing through a window. T.649.

Celia O'Brien ("O'Brien") was the property manager for the apartment complex where Monk was living in 2005. T.665-67. According to O'Brien, she saw him wearing his arm braces a "couple times" in 2005 when he came to talk to her; she opined that it was "generally because he couldn't pay rent or there was some circumstance that [she] needed to feel sorry for him . . . ." T.667. O'Brien testified that she saw, on the property surveillance videotape, an incident in

-12-

which Monk–wearing his arm braces–kicked a door with his left foot hard enough to leave a crack underneath the door handle. T.669.

### 5.      The DNA Evidence

Dr. John P. Simich ("Dr. Simich"), the forensic serologist, testified regarding the four samples of DNA evidence retrieved from the crime scene–the blood droplet on the kitchen floor; the blood smear on the phone cord; fingernail clippings from the victim's left hand; and the stocking with which the victim's hand was bound to the bed. Dr. Simich testified that there were only two DNA profiles found on all of the evidence at the victim's house; one of the profiles was that of the victim. T.723, 727. The victim was not the source of the DNA in the blood on the phone cord; there was only one profile in that sample. On the remaining three pieces of evidence, there were two DNA profiles; as noted above, one was that of the victim. The same male individual was the source of the other DNA profile on the phone cord, the stocking, and the fingernail clippings. T.720.

The DNA profiles of the initial two suspects, DuBose and Johnson, were compared to the evidence found at the victim's house and they were excluded as the source of the DNA. T.725-26.

Dr. Simich compared the unknown DNA profile on the items of evidence to Petitioner's DNA sample in the State databank and found that they matched. T.728. To double-check the match, Dr. Simich then compared the unknown DNA sample to a new DNA sample taken from a buccal swab of Petitioner's mouth; they matched as well. T.730.

Dr. Simich determinatively concluded that Petitioner was the source of the both blood on the phone cord and the floor. T.739. The chance of an individual in the United States having the

-13-

same DNA profile found in the blood droplet and on the phone cord was one in 2.89 quintillion.

T.741-43.  (As a point of reference, there are between 6.7 and 7 billion people on planet Earth.

*Id.*) Dr. Simich concluded that Petitioner could not be excluded as a source of the DNA on the

stocking. The chance of an individual in the United States having the same DNA profile as that

found on the stocking was one in 138 million. T.742. Finally, Dr. Simich determined that

Petitioner could not be excluded as a contributor to the trace portion of DNA found in the nail

clippings. T.739-40.[4]  Notably, Johnson and DuBose were definitively excluded as the source of

that DNA as well as the DNA found on the other items of evidence. T.738.

Notwithstanding defense counsel's extensive cross-examination, the strength of Dr.

Simich's findings regarding the DNA was not meaningfully impeached.

### B.       Summary of the Defense Case

#### 1.       Katherine McIlwain

Defense counsel introduced into evidence the letter sent by Katherine McIlwain

("McIlwain") to Monk dated May 12, 2007, about which she had testified on direct examination.

Her letter to Petitioner read in relevant part as follows:

> Hello, John. I received your letter and am not wrote [sic] to you because I [sic] not
> know what to say. For you things can't be so great in lock-up. I feel bad for you
> but officers said they found D.A. [i.e., DNA] in Sandra's home. So how did your
> D.A. get there, John? If you did this thing just tell the Courts and get it over with.
> Why put yourself through all of this. I really hope and pray that you find peace
> with God . . . .

T.789-90.

___

[4]       Dr. Simich could not give a statistic as to probability with regard to the nail clippings because, in
the DNA sample from the clippings, the amount of genetic markers was below the necessary reporting criteria.
T.742.

McIlwain agreed that Hainesworth did have several boyfriends after her husband passed away. However, she denied knowing whether Hainesworth was involved with a person named Ruffin. T.791.

### 2.     Reverend James A. Lewis, III

Reverend James A. Lewis, III ("Rev. Lewis") testified that he had known Petitioner for "[s]even, maybe eight, nine years" during which time Petitioner lived at several boarding houses run by Rev. Lewis and was a member of the congregation and choir at Rev. Lewis' church, the J.W. Loguen Memorial African Methodist Episcopal Zion. T.794-95. According to Rev. Lewis, Petitioner "had a horrible time walking" and "most of the time . . . was assisted by arm braces on a crutch." T.795. It appeared that Monk had a "very, very difficult time walking". At the church, they had to arrange for him to sit on the aisle seats and use the back stairway that had a railing. T.795. They had to make the bathroom and stairway handicapped accessible in order to accommodate him. *Id.* Rev. Lewis testified that they "had a break" in their relationship because Monk had stopped coming to church for a period of time; Rev. Lewis believed he came back "somewhere around 2005" and was in attendance "quite a few of the Sundays. . . ." T.796-97. Petitioner "was still unable to maneuver as a normal person" and "had trouble with steps and things" and still used the two crutches. T.797.

On cross-examination, Rev. Lewis stated that it "was somewhere in th[e] area" of 2005 or 2006 that he saw Monk again. T.798.

### 3.     Petitioner, John Monk

Monk, who was fifty-eight-years-old, had been on disability since 1994 or 1995. T.803-04.  Monk testified that he began having back problems in the 1970s. T.812. He had a spinal tap

which, he stated, caused him "to go partial limp in both legs." T.812. He had used different types
of back graces over the years in order to alleviate the tingling and numbness going down his legs.
*Id.*

In 2000, Monk had back surgery, which he called "deterioration of the disc". T.813.
Monk could not describe the surgery; he just said it was "very painful". He said he "was opened
up and they cleaned it out and reclosed [him] up." *Id.* Monk testified that it did not relieve his
back problem at all and he continued to seek treatment for it at Erie County Medical Center. *Id*.
He stated that he "constantly" went to physical therapy; that he experienced his leg "locking up";
and that he had hospitalized a "couple times" for "[w]eeks at a time." *Id.* In addition to the
numbness and tingling in his legs, he also experienced "deterioration" of the right knee. T.815.
Monk had surgery on the knee, but it never healed properly and he testified he got "deterioration
arthritis" as a result of it. T.815. Monk testified that his problems in his legs, back, and knee
prevented him from walking or bending his knee sometimes. Monk testified that he had physical
therapy and would see a doctor once a month. T.814. The last time that he sought treatment while
he was not in custody was in June 2005. *Id.*

For the past five years, Monk had been diagnosed with diabetes which, he stated, caused
him to have swelling of his joints and in particular his feet. T.815-16. Sometimes, Monk
testified, he could not put a shoe on and that if he did not take his medication or eat when he was
supposed to he, would pass out. T.816.

Monk testified that the last time he thought he would have been able to climb on top of a
three- or four-foot-high garbage can was "[p]robably in the '90s." T.816. In early to mid-2005,
Petitioner testified, he was taking Loritabs and using a codeine patch for his pain. He also took

medication for his arthritis, diabetes, and high blood pressure. T.816.

Monk explained that he had a romantic relationship with the victim's friend, McIlwain, from about 1998 up until 2000. T.804. After that ended, they continued to be close friends; for instance, she would take him to his various doctor's appointments. T.805.  Monk explained that McIlwain wrote to him and "constantly" asked about the situation with the criminal charges; he wrote back explaining his innocence and trying to give her details about times and dates. T.805. Monk testified that he had noticed a decline in her memory over the years in that she did not remember "[a] lot of the dates . . . ." T.806. It was through McIlwain that Monk met Hainesworth in 1995 after church; they would go over to Hainesworth's house after services. T.806.

Monk testified that he was very close to Hainesworth's deceased husband, Leo. Monk recalled that they would have a beer and watch sports together. T.807. Monk testified that he lost contact with them sometime before Mr. Hainesworth died. *Id.*

After Leo Hainesworth's death, Monk began spending time with McIlwain and Hainesworth; he would see them at least once a month because McIlwain would pick them up and take them to the reservation to buy cigarettes. T.807. Monk testified that he did spend time at Hainesworth's house during that period. *Id.*

According to Monk, he began a romantic relationship with Hainesworth in 2000, which lasted until 2004. He testified that the last time he was at 500 Goodyear was on June 21, 2005, which happened to be three days before her death. T.808. Monk heard about the murder on the news. *Id.*

Monk denied killing Hainesworth and stated that he had no idea who did. T.809.   He knew that "she was seeing someone" but he did not know who it was or what the relationship

was; he stated that Hainesworth "had a lot of friends." T.809.

When asked to explain how his DNA might have gotten in the house, he stated, "I accidentally cut [him]self" and that was the only way he could think it happened. T.809. Monk testified that they were having a drink in the kitchen, and he accidentally broke a glass and nicked himself; "[w]hen you drinking alcohol and you nick yourself . . . it's a fearsome bleed, you know, you bleed real easily." T.810. According to Monk, it occurred in April 2005. *Id.*

With regard to his DNA being found on the victim's stockings, Monk stated that he had taken the victim's stockings off her legs when they were romantically involved. T.810-11.  With regard to the DNA under Hainesworth's fingernails, Monk said that "[m]aybe" it came to be there during one of their "romantic sessions". T.811. On cross-examination, Monk admitted that none of his or the victim's friends and acquaintances could substantiate his claim that Monk and the victim were romantically involved. Furthermore, Monk denied that he affirmatively told Det. Aronica that he had never been in a romantic relationship with the victim. Monk also claimed that he never told Det. Aronica that the last time he had been to the victim's house was, at the latest, in 2004.

### D.    The Verdict and Sentencing

The indictment charged Petitioner with one count of first degree murder (New York Penal Law ("P.L.") § 125.27(1)(a)(vii) (murder committed during the course of a first degree burglary), one count of second degree (intentional) murder (P.L. § 125.25(1); one count of second degree (felony) murder (P.L. § 125.25(3)), one count of first degree burglary (P.L. § 140.30(3)), and one count of third degree criminal possession of a weapon (P.L. § 265.02(1)). All five of these counts were submitted to the jury.

Because the jury returned a verdict convicting Monk of first degree murder and first degree burglary, the jury was not required to consider the counts charging him with second degree murder. Monk also was convicted of the weapons-possession charge.

Monk was sentenced, and is currently serving, a term of life-imprisonment without the possibility of parole.

### E.    The Direct Appeal

The Appellate Division, Fourth Department, unanimously affirmed Petitioner's conviction on direct appeal. The New York Court of Appeals denied leave to appeal.

After completing his direct appeal, Petitioner brought no further state court proceedings.

### F.    The Habeas Proceeding

Monk filed this timely habeas petition seeking to raise two of the issues that he had presented to the Appellate Division–that the trial court erred in denying his request to introduce his medical records without accompanying expert testimony and that the prosecutor committed misconduct. Respondent submitted an answer and memorandum of law in opposition to the petition. Monk did not submit a traverse in reply to Respondent's answer.

The parties have consented to final disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

For the reasons that follow, the petition is dismissed.

## III.    Analysis of the Petition

### A.    Erroneous Exclusion of Medical Records

As his first ground for relief, Petitioner asserts that he was denied his constitutional right to present a defense by the trial court's refusal to admit his medical records into evidence.

Respondent argues that the introduction of the Petitioner's medical records into evidence would have caused confusion with the jury which in turn would have led to undue prejudice to the People. Without an expert to explain the effect of the injury, Respondent asserts, the introduction of the medical records "would merely show that petitioner had a back injury" and, standing alone, " would have invited the jury to improperly speculate as to what extent the disability could have limited petitioner's mobility." Resp't Mem. at 14.  Respondent argues that "[c]onsequently, petitioner's claim is not of constitutional import and should not be reviewed by this Court." Resp't Mem. at 12.

Respondent contends that because the claim regarding the exclusion of medical records is predicated on a state court's evidentiary ruling, it does not present a constitutional issue cognizable in a habeas corpus petition. Resp't Mem. at 10. As Respondent notes, Under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner only on the ground that he is in custody in violation of the Constitution, laws or treaties of the United States. Mere errors of state law generally not cognizable on federal habeas review. *See*, *e.g.*, *Estelle v McGuire*, 502 U.S. 62, 67-68 (1991).

The Supreme Court, however, "has found unconstitutional the rigid application of state evidentiary rules prohibiting presentation" of exculpatory evidence. *Hawkins*, 460 F.3d 238, 244 (2d Cir. 2006) (citing *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir.2003) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)), *cert. denied sub. nom. Hawkins v. Perlman*, 549 U.S. 1215 (2007). In this vein,"where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Even where an evidentiary ruling was correct under the state's evidentiary rule, the federal court

should still consider whether that evidentiary rule is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve'" such that its application "infringed upon a weighty interest of the accused," *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 37 (1987)); *accord*, *e.g. Hawkins v. Costello*, 460 F.3d at 244.

### 1.    The State Courts Adjudicated the Claim on the Merits.

Where, as here, a state court adjudicates a habeas petitioner's claim on the merits, the reviewing court must assess that decision under the deferential standard established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in 28 U.S.C. § 2254(d). *Hawkins v. Costello*, 460 F.3d at 244 (citing *Sellan v. Kuhlman*, 261 F.3d 303, 310-11 (2d Cir. 2001)).

Applying AEDPA deference, a federal court may grant a writ of habeas corpus if the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

### 2.    Clearly Established Law Regarding the Right to Present a Defense

It is clearly established Supreme Court precedent that a criminal defendant possesses a constitutional right–grounded in the Sixth Amendment's Compulsory Process and Confrontation Clauses and the Fourteenth Amendment's Due Process Clause–to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted); *accord Hawkins*, 460 F.3d at 243.  "'Few rights are more fundamental than that

of an accused to present witnesses in his own defense.'" *Hawkins*, 460 F.3d at 243 (quoting *Chambers*, 410 U.S. at 302).

Although a defendant's right to present a complete defense is well-established, it is "not without limits and 'may in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Id.* (quoting *Chambers*, 410 U.S. at 295); *accord*, *e.g.*, *Jimenez v. Walker*, 458 F.3d 147 (2d Cir. 2006) ("As with many rights, the right to present a defense is not unlimited."). Thus, courts require a defendant to "comply with established rules of procedure and evidence designed to assure both fairness and reliability. . . ." *Chambers*, 410 U.S. at 302; *accord Hawkins*, 460 F.3d at 243; *see also Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (stating that a defendant does not have an "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Clark v. Arizona*, __ U.S. __, __, 126 S. Ct. 2709, 2731 (2006) ("[T]he right to introduce relevant evidence can be curtailed if there is a good reason for doing that."). Even before AEDPA required a more deferential review of state court decisions, the Supreme Court had expressed a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts[,]" *Crane*, 476 U.S. at 689, noting that it had "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability–even if the defendant would prefer to see that evidence admitted[,]" *id*. at 690.

In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, the reviewing court should start with "the propriety of the trial court's evidentiary ruling." *Wade v*, 333 F.3d at 59; *accord*, *e.g.*, *Hawkins*, 460 F.3d at 244; *see also Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001). It is, of course, well established that

"habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "[N]ecessarily include[d]" in that category of mere state-law errors that do not warrant habeas relief are "erroneous evidentiary rulings[,]" *Hawkins*, 460 F.3d at 244. However, the inquiry "into possible state evidentiary law errors at the trial level" assists the reviewing court in "ascertain[ing] whether the appellate division acted within the limits of what is objectively reasonable." *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (quoted in *Hawkins*, 460 F.3d at 244).

If potentially exculpatory evidence was erroneously excluded, the reviewing court then looks at "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)) (alteration in original)); *accord Hawkins*, 460 F.3d at 244 (citing *Wade*, 333 F.3d at 59 (stating that "[t]his test applies post-AEDPA")). If, on the other hand, the state court's evidentiary ruling was correct as a matter of state evidentiary law, the habeas court's "inquiry is more limited[,]" addressing itself only to "whether the evidentiary rule is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. at 56); *see also Holmes v. South Carolina*, 547 U.S. 319, ___, 126 S. Ct. 1727, 1731 (2006)). A state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

### 3.    The Trial Court's Evidentiary Ruling

A part of Petitioner's defense was that due to alleged disabilities resulting from a back injury and related surgery, it was physically impossible for him to climb up on top of the blue

garbage tote, break the window of the victims's house, and enter into the house to burglarize it. *See*, *e.g.*, T.812-18. In support of this argument, defense counsel sought to introduce certified copies of Petitioner's medical records over a period of several years indicating that, *inter alia*, he underwent back surgery in 2002 and "a lot more" medical treatment since that time. T.684. Defense counsel indicated that Petitioner would testify as to his own medical condition. Counsel urged that the medical records be introduced into evidence, stating without the medical records, Petitioner's testimony regarding his disabilities "wouldn't make sense to the jury." T.685.

At first, the prosecutor argued that whether or not Petitioner had back surgery was "completely irrelevant to his ability to have or have not committed this crime" because "an operation is usually meant to cure people, not to make them worse." T.684. The trial court correctly recognized that a physical disability on Petitioner's part would be relevant to whether he could have committed the crime as theorized by the prosecution. *Id.*

Next, the prosecutor objected to the introduction of the records on the grounds that without an expert to elucidate the nature of Monk's medical condition and the related medical treatment, the jury would be "encourage[d] to speculate that because he had a minor operation regarding his discs three years prior" to the murder "that somehow affects his ability to have gotten on top of the garbage tote and to climb through the window." T.685-86. The prosecutor argued that because Petitioner's physical limitations were "not facially obvious on the medical records[,]" the jury would be "require[d] to utilize some kind of knowledge or expertise that's not a part of the record." T.686.

Defense counsel responded that "[t]hat's what the issue of fact is" and stated "[i]t would be proper for the D.A.'s office to call an expert to help interpret the records to [sic] the jury, if

that's his position." T.686.

The trial court posed the question, "Wouldn't that be the next move, to call someone [in rebuttal by the prosecution] who could say that his surgery would have no effect on someone's ability to do certain acts, rather than have the jury speculate as to they whether they [sic] can or can't?" T.686. The prosecutor agreed, but argued that it would require a *defense* expert to first elucidate the contents of the records in order to make them relevant. T.686. The prosecutor argued that the defense should no be permitted "to just simply throw [the records] in there, hope the jury speculates" and then require the prosecution to attempt to rebut the medical records. T.686.

Observing that there is "no presumption that a person cannot do a certain physical act because they had back surgery[,]" the trial court asked, "[I]s it not a leap to have the jury presume that . . . the surgery or treatment is the cause of someone's inability to do something without first [offering] medical [expert] opinion?" T.687.  Defense counsel argued that the medical records "support[ed] Mr. Monk's position that he was physically unable" to perform the act of climbing up on the garbage tote and going in through the window. *Id.* When pressed by the trial court on the issue of "who is to say" that Monk could or could not do certain things, defense counsel asked if the trial court was suggesting that he subpoena the doctor. T.688. The trial court replied,

> All I'm suggesting is inasmuch as the prosecution thinks it's improper to have the jury presume inability to do something, it seems the defense is asking the jury to do the same thing simply by virtue of [the medical] records. If I had shoulder surgery and I say I can't throw something now, well, maybe I can, maybe I can't. It would seem to me that I would have to have a medical person come in and say mechanically he cannot do that because of the procedure we performed.

T.688. Defense counsel responded, "I don't think it's necessarily whether he medically could or

could not do it, but [the] medical records support the defense's position that he's had these

medical problems." T.689. The following colloquy ensued:

| The Court: | He may have had them [i.e., the medical problems] but if the medical records do not point to the inability to do an act then why are they relevant? |
| --- | --- |
| [Trial Counsel]: | They're relevant because it's not just a matter of whether he absolutely could or could not do it. There's a gray area there. There's an issue of fact of whether or not it was likely that he could do it. You would have two extremes. You would have a paraplegic where the medical records would say that a person couldn't have done it or someone with no record where the person–it wouldn't be credible for him to say he couldn't do it. This case is someplace in between. |
| The Court: | I understand, but a person testifying I cannot do something is a matter of credibility. Records by themselves are a matter of potential speculation as to whether someone can do something or not. |
| [Trial Counsel]: | I submit they merely support Mr. Monk as he goes through his medical history. Just like [the coroner] and just like [the police officer] reviewing their notes of an ongoing situation, I'm going to ask Mr. Monk to review his records, which is [sic] his medical history. |

T.689-90. After reviewing the records during a recess, the trial court issued the following ruling:

> [T]he medical records are relevant material to establish the defendant's prior medical history and treatment, including any that may have occurred around the time of the incident; however, they're not material without expert testimony to establish any physical limitations of the defendant to the medical history or treatment. The records alone, without expert testimony, invites [sic] speculation by the jury, so the records may be marked and used to refresh the defendant's recollection regarding treatment dates, but they will not be admitted into evidence without expert testimony. That goes for both sides. It invites speculation. So that's my ruling.

T.743-44.

### 4.     The Appellate Division's Ruling

-26-

On direct appeal, Petitioner argued that the ruling was erroneous as a matter of state law and denied him his constitutional right to present a defense. Petitioner noted that the trial court had correctly ruled that the medical records were relevant but stated that the court incorrectly determined that the jury needed expert testimony to explain the records, since the records "spoke for themselves." Petitioner's Appellate Brief at 13 (Resp't Ex. B). Petitioner argued that rather than inviting speculation, the medical records "would have simply permitted an inference that [he] had physical limitations due to his surgery and recent treatment." *Id.*

On Monk's direct appeal, the Fourth Department agreed with the prosecution that Monk's medical records unaccompanied by expert testimony would have invited speculation by the jury:

> Contrary to the contention of defendant, [the trial court] properly refused to admit his medical records in evidence. It is well settled that "[t]rial courts are accorded wide discretion in making evidentiary rulings and, absent an abuse of discretion, those rulings should not be disturbed on appeal" (*People v. Carroll*, 95 N.Y.2d 375, 385, 718 N.Y.S.2d 10, 740 N.E.2d 1084). Here, the court determined that defendant's medical records were relevant insofar as the theory of the defense was that defendant was physically incapable of entering the victim's home by climbing on top of a garbage tote. Nevertheless, the court did not abuse its discretion in refusing to admit those medical records in evidence without additional expert medical testimony inasmuch as, without such explanatory testimony, the jury would necessarily engage in impermissible speculation whether defendant's prior back surgery and subsequent treatment would have made it difficult, if not impossible, for defendant to enter the victim's home in the manner alleged by the People (*see People v. Young*, 295 A.D.2d 631, 632, 745 N.Y.S.2d 177 [(App. Div. 2d Dept. 2002), *lv. denied* 99 N.Y.2d 541, 752 N.Y.S.2d 602, 782 N.E.2d 580; *cf. People v. Smith*, 195 A.D.2d 265, 266, 599 N.Y.S.2d 582).

*People v. Monk*, 57 A.D.3d 1497, 1498, 871 N.Y.S.2d 514, 515 (App. Div. 4th Dept.).

After reviewing the state authorities cited by the Fourth Department and Monk, I disagree with the trial court's and state appellate court's rulings that introduction of the medical records were inadmissible because they would have required the jury to "engage in speculation." While I

believe the reasoning was incorrect, the ultimate evidentiary ruling did not amount to an objectively unreasonable application of clearly established Supreme Court law regarding a defendant's right to present a defense.

As an initial matter, the Fourth Department did correctly recognize, by its citation to *People v. Carroll*, 95 N.Y.2d 375 (N.Y. 2000), "[a] court's discretion in evidentiary rulings is circumscribed by the rules of evidence *and the defendant's constitutional right to present a defense*[.]" *Id.* at 385 (citing *People v. Hudy*, 73 N.Y.2d 40, 57 (N.Y. 1988), *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513 (2000); *Chambers v. Mississippi*, 410 U.S. at 294 ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.") (emphasis supplied)).

"Evidence is relevant if it has any 'tendency in reason to prove any material fact[.]'" *Id.* (quoting RICHARDSON, EVIDENCE § 4, at 2 (Prince 10th ed.) (quotation omitted)). More specifically stated, "[r]elevant evidence means 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence[.]'" *People v. Davis*, 43 N.Y.2d 17, 27 (N.Y. 1977) (quoting Uniform Rules of Evidence, rule 401 (1974)). In other words, relevant evidence "tends to convince that the fact sought to be established is so[.]" *Id.* (citation omitted). As the trial court and the Fourth Department correctly found, Monk's medical records were relevant insofar as the theory of the defense was that defendant was physically incapable of entering the victim's home by climbing on top of a garbage tote.

"All relevant evidence is admissible unless its admission violates some exclusionary rule[.]" *People v. Lewis*,  69 N.Y.2d 321, 324 (N.Y. 1987) (citing *Ando v. Woodberry*, 8 N.Y.2d

165, 167 (N.Y. 1960)).  New York's rules of evidence did not prohibit the introduction of

Monk's medical records. Hospital records fall within the business records exception to the

hearsay rule as long as the information therein relates to the diagnosis, prognosis or treatment.

*People v. Wright*, 81 A.D.3d 1161, __,  918 N.Y.S.2d 598, 603 (App. Div. 3d Dept. 2011) (citing

*People v. Ortega*, 15 N.Y.3d 610, 617 (N.Y. 2010); *People v. Rogers*, 8 A.D.3d 888, 892, 780

N.Y.S.2d 393 (App. Div. 2004); N.Y. CIVIL PRACTICE LAW & RULES § 4518; N.Y. CRIM. PROC.

LAW § 60.10). The trial judge recognized, and apparently the Fourth Department did as well, that

the medical records were admissible under the "business records" exception to the rule against

hearsay. *E.g.*, *Joyce v. Kowalcewski*, 80 A.D.2d 27, 29 (App. Div. 4th Dept. 1981) ("There is no

question that the medical records which plaintiff sought to admit into evidence were duly and

properly authenticated by the custodian of such records. This is all that is required pursuant to

CPLR 4518 (subd(c)) as a prerequisite to their admissibility. Accordingly, the trial court erred in

ruling that the proffered medical records could not be received in evidence merely because they

had not been subpoenaed. Such error seriously impaired plaintiff's attempts to establish the

nature and seriousness of his injuries.").

The evidence clearly was relevant, and did not violate a state evidentiary rule. Indeed,

Monk's appellate counsel drew the Fourth Department's attention to one of their previous cases,

*People v. Egbert*, 122 A.D.2d 599 (App. Div. 4th Dept. 1986), in which the defendant had

proffered certified hospital records showing his own treatment. The Fourth Department held that

the trial court "erred in refusing to admit a certified copy of hospital records showing treatment

of defendant" since "[t]he records have clearly met the statutory test[.]" *Egbert*, 122 A.D.2d at

599 (citing N.Y. CIVIL PRAC. LAW & RULES § 4518(c) ("All records, writings and other things

referred to in sections 2306 and 2307 [of the C.P.L.R.] are admissible in evidence under this rule

and are *prima facie* evidence of the facts contained, provided they bear a certification or

authentication by the head of the hospital, laboratory, department or bureau of a municipal

corporation or of the state, or by an employee delegated for that purpose or by a qualified

physician."); *Joyce v. Kowalcewski*, 80 A.D.2d at 29; *Matter of Quinton A.*, 68 AD.2.d 394, 399

(App. Div. 2d Dept. 1979), *rev'd on other grounds*, 49 N.Y.2d 328 (N.Y. 1980)). The Fourth

Department in *Egbert* found that the trial court's hearsay "concern about the history portion of

the record presented no bar to its admission since this part could have been redacted."   *Egbert*,

122 A.D.2d at 600. Although the records' exclusion was error, it did "not require reversal since

the records would have been cumulative, there being no dispute that defendant [Egbert] suffered

injuries at the time of his arrest." *Id.*

Monk also cited *People v. Smith*, 195 A.D.2d 265 (App. Div. 1st Dept. 1993), in his

appellate brief in support of his contention that records should have been submitted. In *People v.*

*Smith*, the prosecution's proof indicated that defendant and his cohorts had entered the

complainant's apartment by leaping or jumping through the top part of a bedroom window and

that they were subsequently pursued by the police from the crime scene. One of the police

officers testified that while attempting to evade capture, Smith dropped to the ground from a fire

escape ladder suspended some twelve feet above street level, and rapidly scaled two sets of stairs

and a chain link fence prior to being caught. Smith's defense counsel was prepared to present

evidence showing that Smith suffered from a disabling hip condition for which he had been

medically treated from 1986 until the time of the incident; hospital records Smith would have

offered in evidence had he been permitted to do so, confirmed that Smith's hip condition had

necessitated surgical intervention in 1986 and subsequent intermittent hospital care until at least the time of the burglary. Smith also was going to present expert medical testimony–from either a board-certified orthopedic surgeon who had examined Smith, or Smith's treating physician. It was Smith's contention that those records, together with the medical expert testimony, would have established that he was physically incapable of the various athletically strenuous maneuvers he was said to have performed while attempting to avoid capture, or, in other words, that he could not have been one of the men pursued by the police from the crime scene. The Appellate Division held that the trial court's ruling prevented Smith from presenting evidence both "highly relevant" and "crucial" to his defense of misidentification. The trial court's *in limine* ruling excluding the records and expert medical testimony was grounds for reversal of Smith's conviction. *People v. Smith*, 195 A.D.2d at 266.

Interestingly, the Fourth Department in Monk's case cited *People v. Smith*, 195 A.D.2d 265, with a "*cf.*" I surmise that it found *Smith* to be distinguishable from Monk's situation because in *Smith*, the defendant intended to offer expert medical testimony along with the medical records. However, it is impossible to determine from the *Smith* decision whether the absence or presence of expert testimony would have made any difference in the Appellate Division's ruling that the trial court had committed reversible error in excluding relevant, material, non-cumulative evidence–namely, defendant Smith's medical records.

Turning to the other case cited by the Fourth Department in support of its ruling, the primary support for the Fourth Department's holding was *People v. Young*, 295 A.D.2d 631 (App. Div. 2d Dept. 2002), in which the defendant asserted that the trial court violated his constitutional right to present a defense by precluding him from introducing medical records

concerning his hernia operation. The Appellate Division in *Young* found the claim to be

unpreserved due a lack of timely objection. In any event, the Appellate Division found, "the trial

court providently exercised its discretion in precluding the medical records because that evidence

was completely irrelevant to the defendant's ability to commit the robbery 16 days after

[Young's] discharge, and would have invited the jury to engage in speculation[.]" *People v.*

*Young*, 295 A.D.2d at 632 (citing *People v. Celifie*, 287 A.D.2d 465 (App. Div. 2d Dept. 2001)

("In any event, the trial court providently exercised its discretion in excluding this testimony

*because it was irrelevant and collateral*, and would have invited the jury to engage in

speculation[.]") (citation omitted) (emphasis supplied); *People v. Ortiz*,  259 A.D.2d 271, 272

(App. Div. 1st Dept. 1999) ("The court properly exercised its discretion when it precluded

defendant from introducing medical records concerning the condition of his jaw. These records

contained no information relevant even as to defendant's ability to speak at the time of his

hospitalization, and were *completely irrelevant* to his ability to speak at the time of the drug

transaction three weeks after his discharge. Moreover, the records were illegible and the medical

terminology employed would have been difficult for the jury to interpret without expert

assistance. Thus, any probative value the records may have had would have been outweighed by

the danger that they would have confused or misled the jury[.]") (citing *People v. Davis*, 43

N.Y.2d 17 at 27 (emphasis supplied); *People v. Beecher*, 225 A.D.2d 943, 944 (App. Div. 3d

Dept. 1996) ("At the close of the People's case, defendant made an offer of proof regarding his

physical condition and impending heart bypass surgery. After an extended colloquy in which

defendant's attorney did not articulate a clear purpose for the admission of such testimony,

County Court limited the testimony to the effect defendant's tremor and medication would have

had upon him. In light of this ruling, defendant elected not to present medical testimony and now argues that County Court erred in restricting his proof. We disagree. In the absence of a notice under CPL 250.10, defendant was precluded from introducing evidence of his state of mind or diminished capacity. Moreover, given defendant's failure to establish a nexus between his physical condition and the charges against him, *County Court did not abuse its discretion in precluding the proffered medical testimony as being irrelevant*.") (internal and other citation omitted) (emphasis supplied)).

Significantly, in *Young*, *Ortiz*, *Celifie*, and *Beecher*, the excluded medical evidence was held to be irrelevant. In cases of marginally relevant or collateral evidence, the danger is that the jury will speculate about its relevance to the factual issues to be determined. However, the medical records in Monk's case *were* relevant–as both the trial court and the Fourth Department expressly held. *Young*, *Ortiz, Celifie*, and *Beecher* are not apposite here because they involved evidence that was not relevant. In light of those courts' terminology–i.e., their statements that introduction of the medical records would have invited the jury to speculate–it appears that the trial court and Fourth Department in Monk's case applied the standard used in determining whether evidence as to a collateral matter may be properly excluded.

Although this Court may disagree with the state courts' terminology and even their reasoning, this disagreement is not dispositive; rather, the Court must analyze the result reached and determine whether it was objectively unreasonable. Where, as here, the evidence is clearly relevant to a material fact in issue, it nevertheless "'may be rejected if its probative value is outweighed by the danger that its admission would prolong the trial to an unreasonable extent without any corresponding advantage; or would confuse the main issue and mislead the jury; or

-33-

unfairly surprise a party; or create substantial danger of undue prejudice to one of the parties[.]'"

*People v.  Davis*, 43 N.Y.2d at 27 (quoting RICHARDSON, EVIDENCE, § 147, p. 117 (Prince 10th

ed.) and citing *People v Harris*, 209 N.Y. 70, 82 (N.Y. 1913); MCCORMICK, EVIDENCE, § 185,

pp. 438-440 (2d ed.)). Without an expert witness to explain the terminology employed in the

medical records and the significance of Monk's various injuries and treatments, introduction of

the records could have resulted in delays while the jurors attempted to decipher their contents. I

note that Monk did not easily relate details of his own medical treatments (e.g., what his back

surgery entailed), which he actually experienced first-hand. For a jury comprised of laypersons,

presumably not having had the same medical experiences Monk had undergone, the records

certainly would have been very difficult to interpret without expert assistance. Thus, any

probative value the medical records may have had would have been outweighed by the danger

that they would have confused or misled the jury, or prolonged the trial to an unreasonable extent

without any corresponding advantage. The trial court's and Fourth Department's ultimate

conclusion that the records, although relevant and probative, should not have been admitted, was

not  "arbitrary," *Scheffer*, 523 U.S. at 308, under "standard rules of evidence" governing

admissibility, *Taylor*, 484 U.S. at 410. Thus, I must conclude that the Appellate Division's

determination that the trial court's evidentiary ruling did not violate Monk's right to present a

defense was not objectively unreasonable.

In closing, I note that while the Supreme Court "has found unconstitutional the rigid

application of state evidentiary rules prohibiting presentation" of exculpatory evidence, *Wade v.

Mantello*, 333 F.3d at 57, that did not occur in this case. The trial judge engaged in a thoughtful

and extensive colloquy with the parties, reviewed the medical records *in camera*, and gave

defense counsel the opportunity to call a expert witness to elucidate the medical records in order to have them admitted. When evaluating claims of violation of the right to present a complete defense, the Supreme Court has found the Constitution to be principally (but not always) concerned with state evidentiary rules leading to the "blanket exclusion," *Crane*, 476 U.S. at 690, of categories of evidence when their application is "'arbitrary' or 'disproportionate to the purposes the [rules] are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock*, 483 U.S. at 56). Rather than involving the application of such a rule, the ruling at issue is one of those "ordinary evidentiary rulings by state trial courts" concerning the admissibility of evidence, upon which the Supreme Court has been "traditional[ly] reluctan[t] to impose constitutional constraints." *Crane*, 476 U.S. at 689.

### B.    Prosecutorial Misconduct

In the second ground of his petition, Monk claims that he was denied a fair trial because the prosecutor committed misconduct by improperly cross-examining him about his invocation of his right to counsel, improperly forced him to characterize the prosecution's witnesses as liars, and attempted to shift the burden of proof to the defense. Respondent correctly argues that these claims are unexhausted because they were not included in Petitioner's letter application seeking leave to appeal to the New York Court of Appeals and thus they have not been through one complete round of New York's established appellate review procedures. *See, e.g.*, *O'Sullivan v Boerckel*, 526 U.S. 838 (1999). Petitioner missed the opportunity to raise these claims with the New York Court of Appeals and no longer has any procedure available to him in New York law by which to do so. Consequently, the claims may be deemed exhausted; however, the procedural rule that gives rise to the constructive exhaustion also creates a procedural default which. *Grey v.*

*Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991). Unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice, the claim is procedurally barred from being reviewed on the merits by this habeas court. Here, Petitioner has not alleged cause and prejudice, or that a fundamental miscarriage of justice has occurred in that a constitutional violation has resulted in the conviction of someone who was actually innocent. Nor are such elements apparent on the record before the Court.

In addition, the Appellate Division denied the claims of prosecutorial misconduct on the basis that they were unpreserved for appellate review. As Respondent points out, the Appellate Division invoked an adequate and independent state ground–the contemporaneous objection rule–as the sole basis for denying these claims. Reliance upon an adequate and independent state ground to dismiss a petitioner's federal constitutional claim results in that claim being unavailable for review on the merits by a habeas court unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice. *See*, *e.g.*, *Wainwright v Sykes*, 433 U.S. 72 (1977); *Harris v Reed,* 489 U.S. 255, 262 (1989). Petitioner has not demonstrated or even alleged cause and prejudice, or that a fundamental miscarriage of justice has occurred in that a constitutional violation has resulted in the conviction of someone who was actually innocent. Thus, habeas review of the prosecutorial misconduct claims are precluded because they are subject to an unexcused procedural default.

## IV.   Conclusion

For the reasons stated above, petitioner John Henry Monk's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Monk has

failed to make a substantial showing of a denial of a constitutional right, I decline to issue a

certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Victor E.Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:      April 22, 2011
Buffalo, New York.